UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN D. DULIN,

               Plaintiff,                   CIVIL ACTION NO. 10-10301

       v.                          DISTRICT JUDGE PAUL D. BORMAN

COMMISSIONER OF              MAGISTRATE JUDGE MARK A. RANDON
SOCIAL SECURITY,

               Defendant.

_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## I.    PROCEDURAL HISTORY

### A.    *Proceedings in this Court*

On January 22, 2010, Plaintiff filed the instant suit seeking judicial review of the

Commissioner's decision disallowing benefits (Dkt. No. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B)

and Local Rule 72.1(b)(3), this matter was referred to the undersigned for the purpose of reviewing

the Commissioner's decision denying Plaintiff's claim for a period of disability and Disability

Insurance Benefits (Dkt. No. 3). This matter is currently before the Court on cross-motions for

summary judgment (Dkt. Nos. 14, 15).

### B.    *Administrative Proceedings*

Plaintiff filed the instant claims on February 10, 2006, alleging that he became unable to

work on December 31, 2000 (Tr. 90). The claim was initially disapproved by the Commissioner on

August 4, 2006 (Tr. 62-65). Plaintiff requested a hearing and, on July 18, 2008, Plaintiff appeared

with counsel before Administrative Law Judge (ALJ) E. James Gilda, who considered the case *de novo*. In a decision dated September 3, 2008, the ALJ found that Plaintiff was not disabled (Tr. 11-21). Plaintiff requested a review of this decision on September 8, 2008 (Tr. 9-10). The ALJ's decision became the final decision of the Commissioner when the Appeals Council, on May 21, 2009, denied Plaintiff's request for review (Tr. 6-8).

In light of the entire record in this case, I find that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## STATEMENT OF FACTS

### A. *ALJ Findings*

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since December 31, 2000 (Tr. 16). At step two, the ALJ found that Plaintiff had the following "severe" impairments: post traumatic stress disorder and chronic fatigue syndrome. *Id*. At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. *Id.* Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity (RFC) to perform "simple, unskilled medium work...except [Plaintiff] can [have] no more than occasional interaction with co-workers or the general public" (Tr. 18). At step four, the ALJ found that Plaintiff could not perform his previous work as a sales representative or doing golf club repair. *Id.* At step five, the ALJ denied Plaintiff benefits, because the ALJ found – based on the testimony of a Vocational

Expert – that Plaintiff could perform a significant number of jobs available in the national economy, such as dishwasher (18,000 jobs), hand packager (15,000) or office cleaner (10,000 jobs) (Tr. 21).

## B.    Administrative Record

### 1.    Plaintiff's Testimony and Statements

Plaintiff was born on October 2, 1964 and was 36 years old on his alleged disability on-set date (Tr. 105).  Plaintiff served in the United States Marine Corps from 1982 to 1991 (Tr. 27, 131), and was honorably discharged as a Corporal (E-4) (Tr. 27).

Plaintiff testified that he walked between seven and nine miles to get to the hearing before the ALJ and that it took him about three-and-a-half hours (Tr. 26-27).  Plaintiff stated that he performed chores around the house, such as painting and bailing flood water out of his basement (Tr. 32).  Plaintiff testified that his wife was Ukranian and that he tried to help her with English and that she was teaching him Ukranian (Tr. 33-34, 37).  Plaintiff stated that he did not leave the house, but when questioned by the ALJ, he admitted that he used to walk to the YMCA to go swimming four times a week (Tr. 50).

Plaintiff stated that he had a license to drive and a car, but did not drive and that friends occasionally drove him to doctor appointments (Tr. 35-36).  He testified that he mowed the lawn whenever he received a letter from the city regarding its condition and did the laundry (Tr. 38).  Plaintiff stated that he tried to attend church twice a week, but had difficulty doing so (Tr. 39). He testified that he shopped online to avoid people (Tr. 43).  Plaintiff testified that he had difficulty reading due to poor memory, concentration, and focus and had severe flashbacks several times a month (Tr. 46-47).

Plaintiff reported that he cooked two to three times a week, drove a car short distances, went shopping twice a month, handled his finances, read, and went to church once or twice a month, and could perform chores, but did not (Tr. 139-40). He reported that he had no social activities (Tr. 142).

### 2. Medical Evidence

In June 2004, Plaintiff presented to David Gaffney, M.S.W., a social worker with the U.S. Department of Veterans Affairs (VA), for counseling due to post-traumatic stress disorder (PTSD) and persistent disturbance of the sleep/wake cycle (Tr. 374-75). Plaintiff discussed his past combat experiences, his difficulty with transportation due to a suspended license, and his improved concentration and cognition after stopping his medication (Tr. 374-75). Mr. Gaffney noted that Plaintiff had ongoing indicators of PTSD arousal which interfered with his sleep and job performance (Tr. 375).

The next month, Plaintiff presented to Dr. Sorroche with the VA for a psychiatric assessment (Tr. 372-73). Plaintiff reported difficulty sleeping, stress due to pain, discomfort around people, loneliness, inability to keep a job, very vivid memories of combat, flashbacks, avoidant behavior, exaggerated startle response, hypervigilance, irritability, and frequent crying spells (Tr. 372). Dr. Sorroche diagnosed dysthymia, PTSD, and a mood disorder secondary to chronic pain (Tr. 373).

Plaintiff presented to a doctor with the VA in August 2004 with complaints of chronic pain, poor sleep, and diffuse joint aches and pains (Tr. 267). The doctor opined that Plaintiff's symptoms were likely due to PTSD and mild depression (Tr. 267-68). The doctor also referred Plaintiff for a sleep apnea evaluation (Tr. 269). During the sleep apnea evaluation, Plaintiff reported low energy, tiredness, and difficulty falling asleep; the evaluating doctor stated that the symptoms could be due to depression as well as sleep apnea (Tr. 265). Plaintiff declined a sleep study (Tr. 265).

Plaintiff presented to Dr. Sorroche twice in November 2004 (Tr. 368-69). Dr. Sorroche's treatment notes indicate that Plaintiff complained of depression, irritability, and back pain, and that he prescribed Prozac (an anti-depressant) (Tr. 368-69). The next month, Mr. Gaffney taught Plaintiff the "RCT" technique to help alleviate his traumatic memories (Tr. 367).

That month, Plaintiff also complained to Dr. Haque of chronic fatigue, weakness, heaviness, and lethargy (Tr. 364). Plaintiff had a normal range of shoulder motion; difficulty with the straight leg raising tests; and a slow, but intact, gait (Tr. 365). Dr. Haque opined that Plaintiff's complaints of chronic fatigue, weakness, and tiredness were mostly related to PTSD and dysthymia (Tr. 365).

In January 2005, Plaintiff met with Mr. Gaffney for psychotherapy and complained of flashbacks while at the grocery store (Tr. 363). That month, Mr. Gaffney wrote a letter in which he stated that Plaintiff had "100%" impairment in the areas of occupation, socialization, and intimate relationships due to PTSD (Tr. 241). Mr. Gaffney stated that Plaintiff had difficulty maintaining employment and romantic relationships due to his symptoms (Tr. 241-42). Mr. Gaffney noted that Plaintiff had limited social skills, paranoia, and dissociation and loss of contact with reality during flashbacks (Tr. 242). Mr. Gaffney stated that Plaintiff had physical and emotional difficulty: consistently performing a basic survival level with periods of adequate performance, separated by longer periods of inadequate performance significantly impacting his ability to maintain employment (Tr. 244).

Plaintiff returned to Mr. Gaffney in March 2005 and complained of difficulty sleeping. He did, however, report some improvement in being around the public, but occasionally still had to leave stores (Tr. 360). Plaintiff presented to Mr. Gaffney again in April 2005 and reported that he believed RCT was working, but he slept poorly due to increased cognitive activity and alertness (Tr.

213). Mr. Gaffney taught Plaintiff "eye movement technique protocol for paranoia and arousal" (EMT), using finger taps, and recommended writing in a journal (Tr. 213). Dr. Chalichama examined Plaintiff the same day and continued his mirtazapine and bupropion (anti-depressants) (Tr. 211-12).

Plaintiff presented to Dr. Haque in July 2005 with complaints of chronic arthralgias in his shoulder, elbow, and hip and reported becoming tired after walking 1,500 yards (Tr. 209-10). Plaintiff had normal ranges of motion, but complaints of pain on shoulder and hip motion; negative straight leg raising tests; and a slow, but intact, gait (Tr. 210). Dr. Haque diagnosed PTSD with depression likely contributing to chronic fatigue and arthralgias (Tr. 210). Dr. Haque ordered shoulder and hip x-rays and prescribed etodolac (arthritis medication) (Tr. 211). Shoulder x-rays revealed minor osteoarthritic changes and hip x-rays showed minor abnormalities (Tr. 216-17). Plaintiff met with Dr. Chalichama the same day with complaints of financial difficulties, loneliness, and social isolation (Tr. 204). Plaintiff reported that his medications helped and requested regular counseling (Tr. 204).

Plaintiff presented for psychotherapy with Mr. Gaffney on five occasions between September and December 2005 for treatment of chronic PTSD (Tr. 189, 198-202). Plaintiff reported symptoms such as social isolation, sleep disturbances, breaks from reality during intrusive memories, suicidal ideation, and difficulty with self-care (Tr. 189, 198-202). In September 2005, Plaintiff reported preparing a safe room, not leaving his house, having frequent suicidal ideation, and not caring for himself or his property (Tr. 201). In October 2005, Mr. Gaffney recommended the use of EMT to counter obsessive and paranoid interruptions to RTC (Tr. 201). Later that month, Plaintiff reported that EMT helped him stop flashbacks half of the time (Tr. 199).

In November 2005, Plaintiff reported auditory disturbances at night increasing his paranoia (Tr. 198). Plaintiff presented to Dr. Haque that day with complaints of flashbacks, depression, and suicidal thoughts (Tr. 191). He reported sleeping during the day due to PTSD symptoms, which had worsened and become intolerable at night (Tr. 191). Plaintiff reported swimming regularly and complained of chronic lower back pain (Tr. 191). He stated that he recently fell off the roof while cleaning his gutters (Tr. 191). Plaintiff had tenderness in the lower lumbar spine extending somewhat into the coccygeal area, but no pain with hip motion and negative straight leg raising tests (Tr. 192). Dr. Haque prescribed amitriptyline for arthralgias and ordered x-rays of Plaintiff's sacrum and coccyx and lumbar spine; they revealed a mild, but unchanged, posterior positioning of the coccyx and mild spondylosis of the lumbosacral spine (Tr. 192, 214-15). That day, Dr. Chalichama noted that Plaintiff had intermittent flashbacks and difficulty sleeping, but no suicidal ideation (Tr. 190).

Plaintiff attended therapy sessions with Mr. Gaffney three times between December 2005 and January 2006 (Tr. 181-83, 188). In December 2005, Plaintiff reported increased paranoia, depression, and half-awake flashbacks resulting in loss of bowel functioning twice in one week (Tr. 188). In January 2006, Plaintiff reported switching from sleeping during the night to during the day and a desire to isolate himself (Tr. 183). Plaintiff stated that he went to church, but arrived late and left early to avoid others, and that he volunteered one day a week (Tr. 183).

Later that month, Plaintiff reported sleeping three to four hours a night with medication, if he was already tired, and stated that he had hypervigilance and irritation towards people in parking lots and difficulty with people in stores (Tr. 181-82). Plaintiff described several daily intrusive memories involving his time in the military during combat in Panama and Kuwait (Tr. 182).

In December 2005, Plaintiff began physical therapy for chronic tail bone pain, and on examination displayed reduced hip and knee strength, but full strength in the remainder of his lower extremities (Tr. 185). Plaintiff was discharged after three sessions (Tr. 178-79).

Plaintiff presented to Dr. Haque in March 2006 with complaints of continuing flashbacks and depression, but improved sleep patterns with more sleep during the night (Tr. 172). He reported swimming several times a week; volunteering once a week; and attending church on Sundays, but no other socializing (Tr. 172). Plaintiff had a slow, but stable gait, and normal motor strength, and Dr. Haque scheduled a follow-up appointment (Tr. 173-74).

Plaintiff presented to Mr. Gaffney on six occasions between April and August 2006 (Tr. 168-71, 333-36). In April 2006, Plaintiff reported active ideation about dying, flashbacks, and aches and pains and fatigue (Tr. 170-71). In April and May 2006, Plaintiff reported decreased church attendance and increased isolation (Tr. 169-70). In August 2006, Plaintiff reported restarting his medication after caring for his sick father and stated that it led to increased paranoia, anhedonia, agitation, and anger with sleep problems (Tr. 334). Plaintiff reported improved sleep with medication, but complained of weakness, social isolation, and a significant flashback episode (Tr. 334).

In August 2006, Blaine Pinaire, Ph.D. reviewed Plaintiff's records for the state Disability Determination Service and opined that Plaintiff had PTSD, but did not assess his degree of mental limitations due to insufficient evidence (Tr. 223, 228, 233).

In September 2006, Plaintiff presented to Dr. Chalichama for medication management and reported difficulty with pain and poor sleep, but that bupropion and mirtazapine were helpful (Tr.

332). Plaintiff stated that his pain was worsening, but denied acute flashbacks and suicidal ideation (Tr. 332). Dr. Chalichama continued his medications (Tr. 332).

Plaintiff presented to Mr. Gaffney in December 2006 and reported that he recently had a flashback causing him to damage a fruit stand by diving under it (Tr. 325). Later that month, Plaintiff declined admittance to an intensive PTSD treatment program (Tr. 323).

Plaintiff presented to Mr. Gaffney six times between January and May 2007 for psychotherapy (Tr. 309-11, 317-18, 320-21). In January 2007, Mr. Gaffney advised Plaintiff to use a photonic simulator to fight overarousal and improve sleep, which he later reported gave modest improvement (Tr. 320-21). In April 2007, Plaintiff reported difficulty leaving the house during the day and poor sleep the night before he had to travel anywhere (Tr. 311).

Plaintiff presented to Mr. Langham, a social worker, five times in June and July 2007 for treatment of his chronic mental conditions with psychotherapy and biofeedback, and he displayed a blunt, constricted, or flat affect (Tr. 304-05, 307-09). Mr. Langham opined that Plaintiff could have organic brain damage given his unusual memory problems (Tr. 308). In July 2007, Plaintiff reported a mild flashback where he saw a tank go through a house (Tr. 304).

Plaintiff reported to Mr. Gaffney in August 2007 that the biofeedback helped to control his small flashbacks, but reported continuing difficulties with agoraphobia and time orientation (Tr. 302-03). Plaintiff discussed a recent trip to Washington, D.C., during which he panicked and had to be brought home by his father (Tr. 302). Mr. Gaffney noted "strong positive ongoing impact" with biofeedback treatment on Plaintiff's more chronic PTSD and chronic fatigue symptoms (Tr. 303).

Plaintiff attended sessions with Mr. Langham once a month between August and December 2007 and reported some positive results (Tr. 292, 296, 298-300). In October 2007, Plaintiff showed improved conversational ability and reported that he married a Ukranian woman (Tr. 298).

Plaintiff presented to Dr. Haque in December 2007 and complained of symptoms including chronic arthralgias unrelieved with medications; Dr. Haque recommended daily exercise (Tr. 295). That month, Plaintiff stated to Mr. Gaffney during a psychotherapy appointment that he had a decreased frequency in flashbacks since starting neurofeedback, but had increased arousal, irritation, and intensity of flashbacks (Tr. 292). The next month, Plaintiff reported to Mr. Langham that EEG biofeedback caused headaches, but allowed him to leave the house during the day and go shopping (Tr. 290). Plaintiff reported to Mr. Gaffney the next day that he had significant improvement in the rate and intensity of his flashbacks, improvements in social connection, and decreased phobic responses in social settings (Tr. 289-90).

Plaintiff presented to Mr. Langham or Mr. Gaffney three times in February 2008 and reported suicidal ideation and rage and difficulty adjusting to his new marriage (Tr. 284-87). Plaintiff presented to Mr. Langham or Mr. Gaffney six times in March and April 2008 for psychotherapy and biofeedback treatment (Tr. 275-83). In March 2008, Plaintiff stated to Mr. Gaffney that he was better, but had no functional improvement; Mr. Gaffney noted symptoms ranging from moderate severity to extreme severity on a PTSD check list, except that Plaintiff had no memory impairment (Tr. 281). Mr. Gaffney noted signs of improvement in PTSD and depression with significant ongoing symptomology (Tr. 282). Later that month, Plaintiff stated to Mr. Gaffney that he was not sleeping and that his wife caused him stress (Tr. 278). In April 2008, Plaintiff reported improvement

in his symptoms compared to a year earlier, but stated that he still had to shop at night and had increased pain (Tr. 275-76).

Plaintiff met with Mr. Langham four times in May and June 2008 (Tr. 271-75). In June 2008, Plaintiff reported that he struggled with transportation and had difficulties tolerating the person that drove him to appointments; however, he stated that he noticed more progress (Tr. 272-73).

### 3.    Vocational Expert

During the hearing, the ALJ asked a Vocational Expert (VE) a hypothetical question regarding what jobs could be performed by a person with greater than a high school education and Plaintiff's past work experience who could perform medium exertional work that did not require more than simple, unskilled tasks and did not "require {inaudible} interaction with coworkers or the general public" (Tr. 57). The VE testified that such a person could work as a dishwasher, hand packager or office cleaner, with a total of 43,000 such positions in Michigan (Tr. 57-58).

### C.    *Plaintiff's Claims of Error*

Plaintiff raises four overarching arguments on appeal: (1) that the ALJ erred in not providing reasons for rejecting the opinion of Plaintiff's therapist, Mr. Gaffney (Pl.'s Brief at 22-26); (2) that the ALJ erred in finding that Plaintiff's alleged shoulder, hip, and lower back pain were not severe impairments (Pl.'s Brief at 27); (3) that the ALJ did not properly assess Plaintiff's complaints of pain and otherwise erred in finding Plaintiff's statements regarding his symptoms were less than fully credible (Pl.'s Brief at 27-28); and (4) that the ALJ's decision was not supported by substantial evidence to the extent that the ALJ relied on the vocational expert's (VE) response to a hypothetical question that allegedly did not accurately portray Plaintiff's mental and physical limitations (Pl.'s Brief at 29-30).

## III.    DISCUSSION

### A.    *Standard of Review*

In enacting the Social Security system, Congress created a two-tiered system in which the administrative agency handles claims, and the judiciary merely reviews the agency determination for exceeding statutory authority or for being arbitrary and capricious.  *See Sullivan v. Zebley*, 493 U.S. 521 (1990).  The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council.  *See Bowen v. Yuckert*, 482 U.S. 137 (1987).  If relief is not found during this administrative review process, the claimant may file an action in federal district court.  *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).  In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  "It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may...consider the

credibility of a claimant when making a determination of disability."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, particularly since the ALJ is charged with observing the claimant's demeanor and credibility.") (quotation marks omitted); *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247, quoting, Soc. Sec. Rul. 96-7p, 1996 WL 374186, *4.

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, this Court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*en banc*). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers*, 486 F.3d at 241; *Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted), citing, *Mullen*, 800 F.2d at 545.

The scope of this Court's review is limited to an examination of the record only. *See Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *See*

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court must discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal citation marks omitted); *see also Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed.Appx. 521, 526 (6th Cir. 2006).

### B. Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord, Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed.Appx. 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program ("DIB") of Title II (42 U.S.C. §§ 401 *et seq*.) and the Supplemental Security Income Program ("SSI") of Title XVI (42 U.S.C. §§ 1381 *et seq*.). Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

-14-

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); *see also*, 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments, that "significantly limits...physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, 2008 WL 4793424 (E.D. Mich. 2008), citing, 20 C.F.R. §§ 404.1520, 416.920; *Heston*, 245 F.3d at 534.  "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates."  *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by his impairments and the fact that he is precluded from performing his past relevant work."  *Jones*, 336 F.3d at 474, cited with approval in *Cruse*, 502 F.3d at 540.  If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers

to the Commissioner. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241; 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

### C.    *Analysis and Conclusions*

As noted earlier, Plaintiff raises four arguments on appeal, namely: (1) that the ALJ erred in not providing reasons for rejecting the opinion of Plaintiff's therapist, Mr. Gaffney (Pl.'s Brief at 22-26); (2) that the ALJ erred in finding that Plaintiff's alleged shoulder, hip, and lower back pain were not severe impairments (Pl.'s Brief at 27); (3) that the ALJ did not properly assess Plaintiff's complaints of pain and otherwise erred in finding Plaintiff's statements regarding his symptoms were less than fully credible (Pl.'s Brief at 27-28); and (4) that the ALJ's decision was not supported by substantial evidence to the extent that the ALJ relied on the vocational expert's (VE) response to a hypothetical question that allegedly did not accurately portray Plaintiff's mental and physical limitations (Pl.'s Brief at 29-30). Each argument is discussed below:

### 1.    The Opinion Of Mr. Gaffney, A Social Worker, Is Not Entitled to Controlling Weight

Plaintiff first argues that the ALJ erred in not providing reasons for rejecting the opinion of his therapist, Mr. Gaffney (Pl.'s Brief at 22-26). However, the opinion of Plaintiff's therapist Mr. Gaffney, a Licensed Master Social Worker, is not entitled to controlling weight, contrary to Plaintiff's argument. Medical opinions from treating sources are generally entitled to controlling weight. *See* 20 C.F.R. § 404.1527. Only medically acceptable sources may deliver medical opinions; social workers are not acceptable medical sources. *See* 20 C.F.R. §§ 404.1513(a),

416.913(a); *see also Pellow v. Astrue,* 2010 WL 1626396 (E.D. Mich., March 31, 2010). Thus, Mr. Gaffney's opinion, while relevant evidence, is not entitled to controlling weight. Also, it is evident from the ALJ's decision that he considered Plaintiff's therapy records from Mr. Gaffney, as the ALJ notes that Plaintiff "expressed difficulty with dealing with others, anxiety, insomnia and other symptoms..." (Tr. 19).

Furthermore, the ALJ did not explicitly reject Mr. Gaffney's opinion that Plaintiff had "100%" impairment in the areas of occupation, socialization, and intimate relationships due to PTSD (Tr. 241). However, in contrast to Mr. Gaffney's opinion, the ALJ did provide numerous reasons for finding that Plaintiff's condition decreased, but did not eliminate, his ability to perform work-related functions (Tr. 18-20). The ALJ found that Plaintiff's mental health treatment records were not inconsistent with the conclusion that Plaintiff could perform simple, unskilled medium work, with no more than occasional interaction with coworkers or the general public (Tr. 19).

Additionally, although Plaintiff claimed that he had difficulties performing daily activities, the ALJ correctly noted that Plaintiff's reported daily activities conflicted with Mr. Gaffney's extreme opinion (Tr. 19). For instance, although Mr. Gaffney opined that Plaintiff had difficulty performing at even a basic survival level (Tr. 244), Plaintiff reported in June 2006 that he cooked two to three times a week, drove a car short distances, went shopping twice a month, handled his finances, and read (Tr. 139-40). Although Plaintiff reported that he did not perform chores, he testified at the hearing that he performed odd jobs around the house such as painting and bailing flood water out of his basement (Tr. 32). Furthermore, despite Mr. Gaffney's opinion that Plaintiff had difficulty maintaining romantic relationships (Tr. 242), Plaintiff testified at the hearing that he had married a Ukranian woman and that he tried to help her with English and that she was teaching

him Ukranian (Tr. 33-34, 37). Because social worker's opinions are not entitled to controlling weight and the ALJ considered Plaintiff's records from Mr. Gaffney, Plaintiff has not established reversible error.

### 2. Substantial Evidence Supports The ALJ's Finding That Plaintiff's Arthralgias Were Not Severe Impairments

Plaintiff next argues that the ALJ erred in finding that his shoulder, hip, and lower back pain were not severe impairments (Pl.'s Brief at 27). Defendant responds that the ALJ reasonably concluded that Plaintiff's back and joint pains were not severe impairments because examination findings were negative and diagnostic studies showed no more than mild abnormalities (Tr. 15-16). Defendant is correct. An impairment or combination of impairments is not severe if it does not significantly limit Plaintiff's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a).

A review of the record indicated that shoulder x-rays in July 2005 revealed only "minor" osteoarthritic changes (Tr. 216). X-rays of Plaintiff's sacrum, coccyx, and lumbar spine in November 2005 showed a mild, but unchanged, posterior positioning of the coccyx and mild spondylosis of the lumbosacral spine (Tr. 192, 214-15). In addition, although Plaintiff had difficulty performing a straight leg raising test during one appointment, straight leg raising tests were negative on several other occasions (Tr. 173, 192, 210, 365). Finally, the ALJ noted that his conclusion was supported by Plaintiff's testimony that he walked for several hours to the hearing, despite being able to drive (Tr. 17, 26-27). As such, the ALJ's decision not to find that Plaintiff's arthralgias to be severe impairments is based on substantial evidence, and the undersigned finds no reason to disturb the ALJ's conclusions on appeal.

### 3.      Substantial Evidence Supports the ALJ's Credibility Finding

Plaintiff next argues that the ALJ did not properly assess his complaints of pain and otherwise erred in finding his statements regarding his symptoms were less than fully credible (Pl.'s Brief at 27-28).   This Court does not make its own credibility determinations.   *See Lawson v. Comm'r of Soc. Sec.*, 192 Fed. App'x 521, 528 (6th Cir. 2006).   The Court cannot substitute its own credibility determination for the ALJ's.   The Court's "review of a decision of the Commissioner of Social Security, made through an administrative law judge, is extremely circumscribed ...." *Kuhn v. Comm'r of Soc. Sec.*, 124 Fed. App'x 943, 945 (6th Cir. 2005).   The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the deferential "substantial evidence" standard.   "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Comm'r of Soc. Sec.*, 152 Fed. App'x 485, 488 (6th Cir. 2005).   "Since the ALJ has the opportunity to observe the demeanor of the witness, his conclusions with respect to credibility should not be discarded lightly and should be accorded deference." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d at 1234.   In this case, the ALJ provided a detailed discussion of his reasons for finding that Plaintiff's subjective complaints were not fully credible and the undersigned finds no reason to disturb these findings on appeal.

With respect to Plaintiff's complaints of joint and back pain, the ALJ reasonably concluded that the sparse medical evidence did not support a finding that they more than minimally affected his ability to perform work activities and that Plaintiff's own testimony supported such a conclusion, as discussed above (Tr. 17).   The ALJ also explicitly found that Plaintiff's chronic fatigue syndrome and other conditions could cause his alleged symptoms (Tr. 18), but concluded that Plaintiff's testimony conflicted with his claimed limitations due to chronic fatigue syndrome (Tr. 19-20).   The

ALJ reasonably found that Plaintiff's claimed limitations conflicted with his reports that he was swimming at the YMCA several times a week (Tr. 172) and his testimony that he walked for three and-a-half hours to the hearing (Tr. 26-27).

The ALJ also discounted Plaintiff's credibility because of inconsistences between Plaintiff's claimed limitations and his reported activities (Tr. 18-19). For instance, although Plaintiff testified that he did not perform any sort of outdoor exercise, when questioned further, he testified that prior to marrying his wife, he walked to the YMCA several times a week to go swimming (Tr. 50). The ALJ also noted that Plaintiff had recently married, which showed that he had the capacity for adaptation and socialization (Tr. 19). The ALJ identified several of Plaintiff's other daily activities that conflicted with his claimed limitations (Tr. 19, 33-34). *See Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (ALJ may consider household and social activities in evaluating complaints of disabling pain or other symptoms). For example, the ALJ noted that Plaintiff reported in his application for benefits that he cooked two to three times a week, drove a car, went shopping, handled his finances, read, and attended church once or twice a month (Tr. 139-41). In sum, substantial evidence supports the ALJ's finding that Plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms were less than fully credible (Tr. 18-20).

### 4.     Substantial Evidence Supports the ALJ's Step Five Finding

Finally, Plaintiff argues that the ALJ's decision was not supported by substantial evidence to the extent that the ALJ relied on the vocational expert's (VE) response to a hypothetical question that allegedly did not accurately portray his mental and physical limitations (Pl.'s Brief at 29-30). Plaintiff argues, in essence, that the hypothetical question was inaccurate in the same manner that the ALJ's RFC finding was flawed. As discussed above, the ALJ's RFC finding was supported by

substantial evidence. Therefore, the VE's testimony in response to a hypothetical question that included the same limitations as the RFC constitutes substantial evidence supporting the ALJ's decision. *See Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 118-19 (6th Cir. 1994) (the hypothetical question posed to the VE need only include those limitations that are supported by the record.).

In sum, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decision makers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

## III. RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED**, that Defendant's motion for summary judgment be **GRANTED** and that the findings and conclusions of the Commissioner be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981). The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*,

829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be no more than 20 pages in length unless, by motion and order, the page limit is extended by the court. The response shall address each issue contained within the objections specifically and in the same order raised.

s/Mark A. Randon
MARK A. RANDON
UNITED STATES MAGISTRATE JUDGE

Dated: December 23, 2010

***Certificate of Service***

*I hereby certify that a copy of the foregoing document was served on the parties of record on this date, December 23, 2010, by electronic and/or first class U.S. mail.*

*s/Melody R. Miles*
*Case Manager to Magistrate Judge Mark A. Randon*
(313) 234-5542